**Opinion issued December 17, 2019.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00334-CR

_____

**JAARON ALEXANDER NEALY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 212th District Court
Galveston County, Texas
Trial Court Case No. 16-CR-2826

## MEMORANDUM OPINION

A jury convicted appellant, Jaaron Alexander Nealy, of aggravated robbery and assessed his punishment at ten years' incarceration. In his sole issue on appeal, appellant argues that there is legally insufficient evidence supporting the jury's

finding that he used or exhibited a deadly weapon during the commission of the robbery. Finding no reversible error, we affirm the trial court's judgment.

## Background

A man wearing a bandana covering the lower portion of his face and brandishing what appeared to be a handgun robbed a convenience store during the early morning hours of September 5, 2016. Deputy S. Hill with the Galveston County Sheriff's Office testified that he identified appellant as a suspect in the case later that day after viewing a photograph captured by the store's surveillance video.

Appellant was subsequently arrested and charged with aggravated robbery. The indictment stated in relevant part that "while in the course of committing theft of property . . . the defendant did then and there use or exhibit a deadly weapon, to wit: an air soft pistol and/or a firearm." The State, however, later abandoned the firearm portion of the indictment.

At trial, Darren Stanley testified that he was working at a convenience store when a man later identified as appellant entered the store wearing a purple bandana over his face. Stanley heard a metallic noise that sounded like a handgun being cocked as appellant approached the counter. According to Stanley, appellant was holding a "grayish blue," "gray-blue, purple" or "bluish purple" "handgun" as he demanded money. Stanley, who had a military background and was familiar with firearms, gave appellant the money out of the drawer, and then put his hands up.

2

Stanley feared appellant was going to shoot him. Stanley also testified that another customer was in the store when appellant arrived but left during the robbery.

The customer who left, Matthew Kalichman, testified that he was standing at the counter, paying for drinks, when a man wearing a deep blue handkerchief over his face walked in the store and pulled out a "gun." Kalichman described the gun as a "silver pistol" with a "bluish tint."

The store's surveillance video also shows appellant, who was wearing a purple bandana, walk up to the front counter with what appears at times to be a light-colored handgun, hold the gun in front of him, and demand money from the cash register. Stanley is standing across the counter from appellant. Although the gun is pointed down towards the counter during most of the robbery, appellant raises the gun slightly in Stanley's general direction as he turns to leave.

The lead investigator in this case, E. Cazares, testified that he searched the home of Kristy Slaten and Mike Rohde one week after the robbery. Appellant, who was friends with Slaten's children, had been staying at the home for several weeks. Cazares found appellant's belongings and a solid black Taurus airsoft pistol in the boys' bedroom where appellant had been sleeping. Slaten also gave Cazares a second airsoft pistol that Rohde had put in their bedroom closet. Cazares identified the gun that Slaten gave him as "a 'Black Ops,' 6-millimeter 1911 Airsoft pistol"

with a silver barrel that was reflective when it was "cock[ed] back" at the injection port. Both airsoft pistols were admitted into evidence.

Cazares testified that the top, or barrel, of the "black ops" airsoft pistol was silver, whereas the Taurus airsoft pistol was solid black.

Cazares testified that he believed appellant used an airsoft pistol during the robbery and that airsoft pistols are capable of causing serious bodily injury because they can put someone's eye out.

When asked about the type of gun used in the robbery, Cazares testified that he believed the "black ops" pistol was used in the robbery because the top, or barrel, of the "black ops" airsoft pistol was silver with an exposed injection port, whereas the Taurus airsoft pistol was solid black and its injection port was not exposed. Cazares further testified that when he reviewed the surveillance video, he "noticed there was kind of two different colors to the handgun when it was displayed. It looks like there was a -- kind of a reflection towards the barrel of the gun." He admitted, however, that he could not tell from a still shot captured by the surveillance video whether the gun used during the robbery was an airsoft pistol.

Deputy S. Hill testified that he is familiar with airsoft pistols because he uses them in basic and SWAT training. After being shown photographs of the "black ops," Hill testified that airsoft pistols were handguns, not pistols, and that airsoft pistols were capable of causing serious bodily injury because they can put an eye

4

out. Hill said an airsoft pistol can be both spring and battery powered. Hill further testified that BB pellets are expelled from spring-loaded pistols at 330 feet per second or over 200 miles per hour.

Slaten testified that appellant was staying at her house in September 2016 when Detective Cazares searched the residence. Detective Cazares removed several items from the residence, including one airsoft pistol he found in the boys' bedroom and a second airsoft pistol that Slaten retrieved from her bedroom closet. According to Slaten, her kids would shoot each other with the airsoft pistols, and, on one occasion, her sons had shot her TV with them. She confirmed that appellant had been staying in her sons' room and had access to the pistols.

Rohde testified that appellant lived with him and Slaten for approximately three weeks in September 2016. Rohde found an airsoft pistol in the living room during that time and he put it in the bedroom closet because it looked real and he believed it was too dangerous to leave around the house where the kids could find it. According to Rohde, the airsoft pistol was gray with silver on top and had "black ops" written on the side. He also described the airsoft pistol as gray, black, or faded gray, and testified that the color could also be described as "blue steel," which he testified is between black and gray. Rohde further testified that there was a warning on the side of the pistol which read "warning-not a toy. Wear eye protection to prevent serious injury to eye."

5

Christopher Slaten testified that he lived with his mother, Kristy Slaten, and stepfather, Rohde, and that his friend, appellant, had been staying at their home on and off for several weeks before the police searched the residence in September 2016. According to Christopher, there were two airsoft pistols in the house that he had shot before using plastic BBs. Christopher testified that he shot them at other kids when they were playing "airsoft wars" and he generally wore safety glasses because a ricocheting BB pellet could cause him to lose an eye. Christopher also testified that neither airsoft pistol found in the home was blue or silver and that neither pistol had "the ammo, the clip." When asked if he was referring to "the place where you put the BBs," Christopher testified, "The clip or cartridge." He further stated, "The $CO_2$ cartridge and BB holster." Christopher also testified that the "black ops" airsoft pistol was spring-loaded and needed to be cocked in order to propel the BBs, whereas the other pistol was powered by $CO_2$ cartridges.

## Sufficiency of the Evidence

In his sole issue on appeal, appellant argues that there is legally insufficient evidence supporting the jury's finding that he used or exhibited a deadly weapon during the commission of the robbery.[1] Specifically, appellant argues that the airsoft

---

[1]     Appellant does not challenge the sufficiency of the evidence supporting any other element of the charged offense.

pistol allegedly used during the robbery is not a deadly weapon because it was not operable, i.e., it did not have a $CO_2$ cartridge or ammunition.

## A.     Standard of Review

We review the sufficiency of the evidence to support a conviction by viewing all of the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005) (applying *Jackson* standard to review of deadly weapon finding). In our sufficiency review, we consider all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or the defense. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). The trier of fact is the sole judge of the weight and credibility of the evidence. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 319. The jury may reject any part or all of a witness's testimony in order to reconcile conflicts. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). If the record supports reasonable, but conflicting, inferences, we presume that the factfinder resolved the conflicts in favor of the

conviction. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016) (citing *Jackson*, 443 U.S. at 326).

We measure the sufficiency of the evidence against a hypothetically correct jury charge. *See Jenkins*, 493 S.W.3d at 599. Such a charge must, among other things, accurately set out the law, be authorized by the indictment, and adequately describe the offense for which the defendant was tried. *Id.* at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*

### B.    Applicable Law

A person commits the offense of aggravated robbery if, in the course of committing theft as defined in Chapter 31, and with intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death and he uses or exhibits a deadly weapon. TEX. PENAL CODE §§ 29.02(a)(2), 29.03(a)(2).

A deadly weapon is defined as "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury" or "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id*. § 1.07(a)(17). "Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent

disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id*. §1.07(a)(46).

## C. Analysis

The application paragraph instructed the jurors to find appellant guilty if they found that appellant "did then and there, while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally or knowingly threaten or place Darren Stanley in fear of imminent bodily injury or death, and [appellant] did then and there use or exhibit a deadly weapon, to wit: an airsoft pistol."

An airsoft pistol is not a "firearm" nor is it a "deadly weapon" per se. *See Adame v. State*, 69 S.W.3d 581, 582 (Tex. Crim. App. 2002) (stating BB gun is not deadly weapon per se). The State, however, may prove that an airsoft pistol is a deadly weapon by presenting evidence concerning its capabilities or use. *See id.* ("With testimony that a BB gun is capable of causing serious bodily injury, it is reasonable for a jury to make a deadly weapon finding.").

The record reflects that appellant had been staying at the Slaten residence before the robbery, he had access to both the Taurus and "black ops" airsoft pistols recovered from the residence, and he had played with the pistols. Both airsoft pistols were admitted into evidence along with surveillance videos from the store. Based on this evidence and Stanley's and Kalichman's testimony describing the "gun" or

9

"handgun" that appellant brandished during the robbery as being silver with a bluish tint, or bluish gray, and appearing bluish-purple when the light hit it, the jury could have reasonably inferred that appellant used or exhibited the "black ops" airsoft pistol during the commission of the robbery. *See Jackson*, 443 U.S. at 319. Although Christopher offered conflicting testimony regarding the color of the "black ops" airsoft pistol, it was the province of the jury to resolve these conflicts and we defer to its resolution of this conflict when evaluating the sufficiency of the evidence. *See id.* at 319, 326.

Appellant argues that although there is evidence that airsoft pistols in general are capable of causing serious bodily injury, there is insufficient evidence that the airsoft pistol allegedly used during this robbery had the same capabilities. According to appellant, the only testimony regarding the pistol's capability was from Christopher who testified that neither the Taurus nor "Black Ops" pistol that he knew about had had a $CO_2$ cartridge or the "ammo, the clip."

In this case, Deputy Hill testified that plastic pellets discharged from spring-loaded airsoft pistols like the "black ops" travel at 330 feet per second or over 200 miles per hour, and Hill and Cazares testified that airsoft pistols can cause serious bodily injury because the pellets they discharge can put someone's eye out. *See* TEX. PENAL CODE § 1.07(a)(46) (defining "serious bodily injury" as "bodily injury that creates a substantial risk of death or that causes death, serious permanent

10

disfigurement, or protracted loss or impairment of the function of any bodily member or organ").

In addition to the officers' testimony about the capabilities of spring-loaded airsoft pistols in general, there is also evidence about the capabilities of the "black ops" airsoft pistol used during the robbery. Christopher and Kristy Slaten, the pistol's owners, testified that the Slaten kids had shot the "black ops" airsoft pistol before the robbery, played "airsoft wars" with it, and even shot up the Slaten's TV on one occasion. Specifically, Christopher testified that he generally wore safety glasses when playing "airsoft wars" with the "black ops" airsoft pistol because he knew that a ricocheting BB could put his eye out. The pistol's capability to cause serious bodily injury is further supported by the warning on its side which reads "warning-not a toy. Wear eye protection to prevent serious injury to eye." No one familiar with the pistol identified any defects or performance issues associated with the pistol. The jury could have reasonably inferred from this testimony that the "black ops" airsoft pistol was functioning properly during the time of the robbery and it was just as capable of causing seriously bodily injury as spring-loaded airsoft pistols in general. *See Jackson*, 443 U.S. at 319.

Although Christopher testified that neither the Taurus nor the "black ops" pistol, that he knew about had had a $CO_2$ cartridge or the "ammo, the clip," this testimony does not establish that the "black ops" airsoft pistol was inoperable,

11

defective, or otherwise incapable of causing seriously bodily harm during the commission of the robbery, as appellant suggests. Christopher and Detective Cazares testified that the "black ops" airsoft pistol was spring-loaded and, therefore, it did not require a $CO_2$ cartridge in order to discharge plastic BB pellets. Thus, the lack of a $CO_2$ cartridge is immaterial with respect to the operability or the capability of the "black ops" airsoft pistol. Christopher's testimony that the pistol did not have ammunition, or an ammunition clip, is insignificant for purposes of our sufficiency analysis. *See Adame*, 69 S.W.3d at 582 ("Whether appellant's BB gun was loaded or unloaded is not significant in [appellate court's sufficiency] analysis. What is significant is that appellant's BB gun was capable of causing serious bodily injury."). This is, in part, because the State was not required to prove that the pistol was loaded when it was used or exhibited during the commission of the robbery, only that it was capable of causing serious bodily injury. *See id.*

Furthermore, even though such a finding is not required, a jury may infer that a gun is loaded under some circumstances, such as "where during a convenience store robbery a defendant threatens serious bodily injury to the convenience store clerk by pointing a BB gun at her." *Id*. Appellant argues that *Adame* is distinguishable because there is no evidence that he pointed the airsoft pistol at Stanley. The surveillance video, however, shows appellant displaying the pistol to Stanley while demanding money from the cash register. Although appellant pointed

12

the pistol down and towards the counter during most of the robbery, he raises the gun slightly in Stanley's general direction as he walks away with the money. The jury could have reasonably inferred that the "black ops" airsoft pistol was loaded based on this evidence and Stanley's testimony that he feared for his life when appellant approached him with what Stanley believed to be a handgun and demanded cash from the register. *See id.* (stating that "[i]t is reasonable to infer that defendants use loaded guns to facilitate convenience store robberies").

The jury also could have reasonably inferred that the "black ops" airsoft pistol was capable of causing serious bodily injury in this instance, and therefore, qualified as a deadly weapon, because appellant displayed the pistol to Stanley and pointed it in Stanley's direction during the commission of the robbery and BBs shot from the "black ops" pistol are capable of putting someone's eye out, even if the pistol is not shot directly at that person, e.g., a ricocheting BB pellet can put someone's eye out. *See generally id.* ("The evidence that appellant displayed the BB gun to the convenience store clerk and that the gun was capable of causing serious bodily injury if pointed and fired at someone is sufficient to support the jury's deadly weapon finding.").

Although an unloaded gun may qualify as a deadly weapon, that is not always the case and it may not always be reasonable for a factfinder to draw inferences in support of a deadly weapon finding based on the specific facts of a case. *See Mosley*

*v. State*, 545 S.W.2d 144, 146 (Tex. Crim. App. 1976). *Mosley*, however, is factually distinguishable. The evidence in *Mosley* established "that the B.B. gun, an air pistol, was unloaded [and] it was never pointed toward the face of the victim." *Id.* at 145. The State's expert witness testified "that the B.B. gun projectile could not penetrate skin, but that there was a good probability it could cause loss of sight if a person were shot in the eye." *Id*. Another witness, however, testified "that the air pistol used by [Mosley] constantly misfired and, when it did fire, the projectile had a very low velocity and rarely went over five feet." *Id.*

Thus, there was evidence that the air pistol Mosley used was defective, inoperable due to its penchant for misfiring, or otherwise incapable of causing serious bodily injury at the time of the robbery. *See id.* Unlike in that case, there is no evidence here that, at the time of the robbery, the "black ops" airsoft pistol was defective, inoperable, or any less capable of causing seriously bodily injury than spring-loaded airsoft pistols in general. Another notable distinction between these cases is that, unlike in *Mosley*, there is testimony in this case that the pistol did not have to be pointed towards the victim's face to be capable of causing serious bodily injury. One of the pistol's owners, Christopher, acknowledged that a ricocheting plastic BB pellet discharged by the "black ops" pistol could put a person's eye out.

To the extent that there is conflicting testimony regarding the operability of the airsoft pistol or its capability to cause serious bodily injury, it was the province

of the jury to resolve these conflicts and we defer to its resolution of this conflict when evaluating the sufficiency of the evidence. *See Jackson*, 443 U.S. at 319, 326.

Viewing all of the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found beyond a reasonable doubt that appellant used or exhibited a deadly weapon during the commission of the robbery, i.e., the "black ops" airsoft pistol. *See id*. at 319; *see also Adame*, 69 S.W.3d at 582 ("The evidence that appellant displayed the BB gun to the convenience store clerk and that the gun was capable of causing serious bodily injury if pointed and fired at someone is sufficient to support the jury's deadly weapon finding.").

We overrule appellant's sole issue.

## Conclusion

We affirm the trial court's judgment.


Russell Lloyd
Justice


Panel consists of Justices Lloyd, Goodman, and Landau.

Do Not Publish.   TEX. R. APP. P. 47.2(b).